# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SHELLY SHAW,

       Plaintiff,

v.                                                   Civ. No. 14-1078 SCY/KBM

MORGAN GRANVIL,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment (ECF No. 29) and Plaintiff's Motion for Summary Judgment (ECF No. 30). Defendant seeks summary judgment as to both Count I (excessive force in violation of the Fourth Amendment) and Count II (battery under the New Mexico Tort Claims Act) of Plaintiff's complaint. In her motion, Plaintiff seeks summary judgment as to Count I only. The Court, having reviewed the motions for summary judgment, the briefing, the relevant law and evidence in the record, and otherwise being fully advised, concludes that Defendant's motion shall be granted in part and Plaintiff's motion shall be denied. Specifically, the Court concludes that Defendant is entitled to qualified immunity on Plaintiff's excessive force claim. Count I of Plaintiff's complaint is therefore dismissed with prejudice. The Court denies summary judgment as to Plaintiff's battery claim.

## I.    INTRODUCTION

On November 8, 2012, Plaintiff Shelly Shaw was arrested at her residence and charged with one count of child abuse arising out of an incident that occurred earlier that day. ECF No. 29-3. Plaintiff was transported to the Valencia County Detention Center for booking. *Id.* During

1

the booking process, Defendant Morgan Granvil, a sergeant employed by the detention center, administered pepper spray to Plaintiff's face after she refused to comply with his and other officers' directives to change into a facility-issued jumpsuit. Pl. Compl. at 3 (ECF No. 1-2); Incident Report (ECF No. 29-5).

On November 26, 2014, Plaintiff filed this lawsuit in state court asserting two causes of action against Defendant in his individual capacity. ECF No. 1-2. In Count I, Plaintiff claims that Defendant's use of physical force and specifically, his use of pepper spray, during the booking process constituted excessive force in violation of the Fourth Amendment. *See id.* ¶¶ 24-28. In Count II, Plaintiff asserts a battery claim under the New Mexico Tort Claims Act (NMTCA), NMSA 1978, § 41-4-1 to -30 (1976, as amended through 2015), based on Defendant's use of pepper spray during the booking process. *See id.* ¶¶ 29-35. The lawsuit was removed by Defendant to this Court. ECF No. 1.

## II.   FACTUAL BACKGROUND[1]

In the early afternoon on November 8, 2012, two deputies from the Valencia County Sheriff's Department went to Plaintiff's residence to question her regarding an incident involving a minor child that had occurred earlier that day. *See* Crim. Compl. (ECF No. 29-3). During questioning, Plaintiff admitted to drinking alcohol earlier that day. *See* Incident Report[2] (ECF No. 29-6); Pl. Dep. 106:1-5, Sept. 29, 2015 (ECF No. 29-2). The officers arrested Plaintiff for child abuse and transported her to the Valencia County Detention Center for booking. *See* Crim. Compl. (ECF No. 29-3).

---

[1] Except as otherwise noted, the following asserted facts are undisputed.

[2] Although Plaintiff challenges the admissibility of the incident report prepared by Deputy King, the Court need not resolve this issue because Plaintiff also testified in her deposition that she drank alcohol on November 8, 2012 prior to her arrest. *See* Pl. Dep. 106:1-5.

Upon her arrival at the detention center, Plaintiff was taken to the booking area for the intake process. Defendant, a sergeant with the detention center, was involved with Plaintiff's booking into the facility and supervised two female detention officers, Janel Jojola and Dorothy Marquez, as they processed Plaintiff. *See* Def. Dep. 29:22-25, 31:16-18, Oct. 15, 2015 (ECF No. 30-1); *See* Jojola Dep. 43:11-24, Nov. 10, 2015 (ECF No. 29-7). The detention officers handcuffed Plaintiff for the booking process. *Id.* at 40:1-7. Officer Jojola testified that Plaintiff was cussing, uncooperative, and refused to answer questions as they began processing her intake paperwork. *Id.* at 30:14-20, 39:1-18, 43:3-5. Plaintiff's booking documents also show that detention center employees observed Plaintiff to be intoxicated and uncooperative from the outset of the intake process. ECF No. 29-4 (intake screening form included officer's observation that Plaintiff was "uncooperative," "intoxicated," and "crying"); *Id.* (intake information sheet check-marked for "intoxicated" and "uncooperative"); ECF No. 29-5 (intake search form noting Plaintiff's "appearance/demeanor" as "drunk" and "combative"); *Id.* (Plaintiff's initial medical assessment notes that she "refused to answer any questions at intake" and "came in intoxicated").

Officers Jojola and Marquez notified their supervisors, including Defendant, of Plaintiff's refusal to answer questions, and Defendant directed the officers to place Plaintiff in a holding cell "to give her time to calm down." Jojola Dep. 44:4-7; *see also* Def. Dep. 33:1-12. Plaintiff, still handcuffed, was placed in an empty holding cell. *See* Def. Dep. 33:5-7; Jojola Dep. 44:22-25. Once inside the holding cell, Plaintiff continued cussing and began kicking the door of the holding cell. *See* Pl. Dep. 181:13-24; Def. Dep. 33:9-12; Jojola Dep. 44:19-21. Defendant testified that Plaintiff was in the holding cell for approximately five minutes at which point he ordered Officers Jojola and Marquez to enter the cell to conduct a strip-out and have Plaintiff change into a facility-issued jumpsuit. Def. Dep. 33:19-23, 39:5-9; Jojola Dep. 45:14-22.

Plaintiff refused to change into the facility-issued jumpsuit and continued to cuss and kick the holding cell door. Jojola Dep. 48:8-13. The officers left the holding cell and informed Defendant of Plaintiff's refusal to change into the jumpsuit. *Id.*

Defendant then approached the holding cell and asked Plaintiff three times to change into the jumpsuit. Def. Dep. 41:12-19. Defendant testified that he spoke to Plaintiff through the food port of the cell. *Id.* Plaintiff refused to comply with the three directives.[3] At this point, Defendant administered a half second burst of pepper spray to Plaintiff's face.[4] *Id.*

Officer Jojola testified in her deposition that the officers, including Defendant, left the holding cell area at this point. *See* Jojola Dep. 55:3-12. The parties dispute how long the officers were gone before Officers Jojola and Marquez re-entered the holding cell in order to change Plaintiff into the jumpsuit. Plaintiff contends that the officers left Plaintiff alone in the holding cell following the pepper spray administration for approximately five to ten minutes. *See* Pl. Mot. at 13 (ECF No. 30).[5] Relying on the times noted in his incident report,[6] Defendant

_____

[3] The parties dispute whether Defendant warned Plaintiff that he was going to pepper spray her. Plaintiff maintains that, according to Officer Jojola's deposition testimony, while Defendant may have given Plaintiff three directives to dress out, he did not warn Plaintiff that refusing to dress-out would result in her getting pepper-sprayed. *See* Jojola Dep. 52:3-15. Defendant relies on Officer Jojola's affidavit, subsequent to her deposition testimony, in which she stated that Defendant warned Plaintiff prior to administering the pepper spray. ECF No. 34-2. Although the citation to Officer Jojola's testimony occurs in briefing on Plaintiff's motion for summary judgment on the federal constitutional claims, this evidence is in the record and the Court will consider it.

[4] There is some dispute in the record concerning Defendant's location in relation to the holding cell at the time he administered the pepper spray. Defendant testified that he administered a half second burst of pepper spray through the food port of the holding cell. *See* Def. Dep. 47:1-3. However, Officer Jojola testified that the holding cell door was opened and Defendant administered the pepper spray inside the cell or through the open door. *See* Jojola Dep. 50:18-22; 52:23-25. The Court agrees with Plaintiff's contention that this dispute is not material because the parties are in agreement that Defendant pepper sprayed Plaintiff in the face irrespective of the location from which he did this. *See* Pl.'s Mot. at 3.

[5] Plaintiff relies on Officer Jojola's deposition as support for this asserted fact. *See* Pl.'s Mot. at 13 (stating that Plaintiff "was left in the holding cell anywhere from 5 to 10 minutes in the enclosed pepper spray filled area" and "*after* this 5 to 10 minutes, Morgan [Defendant] t[old] Jojola and Marquez to go

maintains that only three minutes elapsed before Officers Jojola and Marquez re-entered the

holding cell to change Plaintiff into the jumpsuit. *See* ECF No. 29-5.

Officer Jojola testified that when she and Officer Marquez re-entered the holding cell,

Plaintiff was yelling "it burns." Jojola Dep. 57:1-7. The officers changed Plaintiff into the

jumpsuit and then removed her from the holding cell. *Id.* at 58-59. Plaintiff was taken to the

female unit for a shower in order to decontaminate from the administration of pepper spray. *Id.*

at 60:8-11. According to Defendant's incident report, Plaintiff was in the holding cell for ten

---

back in the cell and change Ms. Shaw's clothing"). However, in the cited portions of the deposition,
Officer Jojola testified that it was "as much as ten minutes" or "five to ten minutes" that Plaintiff was in
the holding cell in *total* after the pepper spray was administered. Jojola Dep. 65:4-10. In other words,
Officer Jojola indicated that for at least part of this five to ten minute period, she was in the cell with
Plaintiff. Moreover, Officer Jojola stated elsewhere in her deposition that she did not recall how long they
waited before going back to the holding cell. Jojola Dep. 56:10-21. To complicate matters further, Officer
Jojola submitted an affidavit after her deposition in which she states that she "has no specific recollection
of how long Plaintiff was in the holding cell" after she received a half-burst of pepper spray. ECF No. 34-
2. The Court concludes that, drawing all factual inferences in favor of Plaintiff, the evidence does not
support a finding that Plaintiff was left alone in her cell for more than five minutes.

[6] Defendant's incident report provided the following timeline:

| | |
|---|---|
| 1540 hrs | Plaintiff "was in booking where she was being non-compliant and refusing the dress out into a facility issued jumpsuit. |
| 1545 hrs | Defendant "gave inmate Shaw [Plaintiff] numerous directives to change out into a jumpsuit which she refused to do." |
| 1550 hrs | "[O]fficers Jojola and Marquez tried to get her to change out and she then begin to get combative with the two officers. At this time I administered a ½ second burst of my facility issued pepper spray to the face of inmate Shaw [Plaintiff]." |
| 1553 hrs | "[O]fficers Marquez and Jojola then changed out inmate Shaw in the holding cell and placed hand restraints on her person" |
| 1600 hrs | Plaintiff "was escorted by Officers Jojola and Marquez to the female unit for post exposure cleaning." |
| 1615 hrs | Plaintiff "was escorted back to medical to be assessed, where she refused all medical treatment" |

ECF No. 29-5.

minutes (1550 to 1600 hrs) following the pepper spray administration before being escorted to the female unit. ECF No. 29-5.

Subsequently, Plaintiff was taken to Medical for an evaluation due to the pepper spray administration, and Plaintiff refused any medical treatment. ECF No. 29-5 (medical narrative notes). Two days after her booking, Plaintiff submitted a medical services request form for medication (Lovastatin) as well as treatment for bruising and swelling on her left foot and right hand. ECF No. 29-5. She was seen by a provider on November 11, 2012. *Id.*

According to Plaintiff's criminal complaint, a New Mexico state court judge made the probable cause determination on November 9, 2012, the day after she was booked in to the detention center. ECF No. 29-3.

## III. PROCEDURAL HISTORY

On November 13, 2015, Defendant moved for summary judgment on Plaintiff's excessive force and battery claims. ECF No. 29. With respect to Plaintiff's excessive force claim, Defendant argues that he is entitled to summary judgment because Plaintiff was not subjected to excessive force under the governing law, and alternatively, that he is entitled to qualified immunity. *Id.* at 10-17. With respect to Plaintiff's battery claim, Defendant maintains that he is not liable because he used no more force than was reasonably necessary to maintain institutional order. *Id.* at 18-19. The Court permitted Plaintiff to file a surreply to Defendant's motion for summary judgment. ECF No. 51.

Plaintiff has also moved for summary judgment on the excessive force claim. ECF No. 30. Plaintiff argues that there are no genuine disputes of material fact concerning this claim and that Defendant's use of pepper spray violated her Fourth Amendment right to be free from excessive force. *Id.* at 7-9.

## IV. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## V. ANALYSIS

### 1. *Plaintiff's Excessive Force Claim (Count I)*

Defendant contends that he is entitled to summary judgment on Plaintiff's excessive force claim for two reasons: (1) Plaintiff was not subjected to excessive force under the governing law, and alternatively, (2) Defendant is entitled to qualified immunity on this claim.

   a. <u>Applicable Legal Standard</u>

As an initial matter, the Court addresses the parties' dispute regarding the legal standard that governs Plaintiff's excessive force claim. As the Tenth Circuit Court of Appeals has explained, "[e]xcessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment—all depending on where the defendant finds himself in the criminal justice system." *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). In this case, Plaintiff

alleges in her complaint that Defendant used excessive force in violation of the Fourth Amendment. In his motion for summary judgment, Defendant initially argued that Plaintiff's excessive force claim should have been brought under the Fourteenth Amendment - rather than the Fourth Amendment - and alternatively, that the Court may consider the Eighth Amendment in evaluating Plaintiff's claim. Def. Mot. at 10-12. Defendant abandoned this argument in his reply brief and now contends that Plaintiff's excessive force claim is governed by the standard recently set forth by the United States Supreme Court in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), for excessive force claims brought by pretrial detainees. Def. Reply at 7. Plaintiff disagrees that *Kingsley* is applicable to the facts of this case and argues instead that the Court should apply the legal standard set forth in *Graham v. Connor*, 490 U.S. 386 (1989) for Fourth Amendment excessive force claims. Pl. Mot. at 7; Pl. Surreply at 2-3.

In *Graham*, the Supreme Court held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395. The Supreme Court explained that application of this standard requires consideration of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The reasonableness inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The Tenth Circuit Court of Appeals has followed *Graham* and its progeny, and held that the Fourth Amendment "protects against 'unreasonable searches and seizures' and pertains to the events leading up to and including an arrest of a citizen previously at liberty" when evaluating an excessive force claim. *See Porro*, 624 F.3d at 1325; *see id.* (citing to an earlier Tenth Circuit decision for the proposition that the "Fourth Amendment [excessive force standard set forth in *Graham*] applies until formal charges are brought or an arraignment is held because force used is part of the seizure."); *see also Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991), abrogated on other grounds by *Johnson v. Jones*, 515 U.S. 304 (1995) (concluding that for purposes of an excessive force claim, Fourth Amendment protections "persist to impose restrictions on the treatment of an arrestee detained without a warrant."). At the other end of the custodial continuum—that is, when an individual is convicted of a crime—the Tenth Circuit has explained that an excessive force claim must proceed under the Eighth Amendment. *Porro*, 634 F.3d at 1325-26.

"[W]hen neither the Fourth nor the Eighth Amendment applies—when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment—[the Tenth Circuit has instructed lower courts to] turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." *Id.* at 1326. By way of example, the Tenth Circuit has indicated that an arraigned pretrial detainee would bring an excessive force claim under the due process clauses of the Fifth or Fourteenth Amendments. *Id.*

It is this latter category of excessive force claims that the Supreme Court recently addressed last year in *Kingsley*. 135 S. Ct. at 2470. The Supreme Court held that the appropriate standard for a *pretrial detainee's* Fourteenth (or Fifth) Amendment excessive force claim is

objective reasonableness - not a subjective standard that takes into account the officer's state of mind. *Id.* at 2473. Thus, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473; *see also id.* (holding that a pretrial detainee can prevail by showing that the officer's action was "not rationally related to a legitimate governmental objective or that it [was] excessive in relation to that purpose."). Of significance here, the Supreme Court in *Kingsley* expressly relied on *Graham* in setting forth the objective standard that now governs excessive force claims brought by pretrial detainees:

> [O]bjective reasonableness turns on the "facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. See *ibid*. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979).

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *See, e.g.*, *Graham*, *supra*, at 396, 109 S. Ct. 1865.

*Kingsley*, 135 S. Ct. at 2473.

Of significance to this case, it remains an open question the exact point at which an individual's excessive force claim transitions from the Fourth Amendment standard set forth in *Graham* for arrestees to the substantive due process standard under the Fifth or Fourteenth Amendments for pretrial detainees that the Supreme Court recently articulated in *Kingsley*. The Supreme Court explicitly noted in *Graham* that it was not deciding the question of "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of

excessive physical force beyond the point at which arrest ends and pretrial detention begins." *Id.* at 395 n.10. In the years since *Graham* was decided, lower courts have had differing views regarding the applicability of the Fourth Amendment standard set forth in *Graham* to individuals whose excessive force claims arise from conduct post-arrest but prior to an appearance before a judicial officer for a probable cause determination.[7] *See, e.g.*, *Austin*, 945 F.2d at 1159; *See Blackmon v. Sutton*, 734 F.3d 1237, 1240 (10th Cir. 2013) (indicating that "we do not know where exactly the Fourth Amendment's protections against unreasonable searches and seizures end and the Fourteenth Amendment's due process detainee protections begin."). In *Kingsley*, Justice Alito stated in his dissent that the Supreme Court still has not decided "whether a pretrial detainee can bring a Fourth Amendment claim based on the use of excessive force by a detention facility employee. If a pretrial detainee can bring such a claim, we need not and should not rely on substantive due process. . . .if a pretrial detainee can bring such a claim, it apparently would be indistinguishable from the substantive due process claim." *Kingsley*, 123 S. Ct. at 2479 (Alito, J. dissenting).

Here, Plaintiff's excessive force claim is based on conduct that occurred after her arrest and transport to the detention center. The central dispute between the parties in this case is whether Plaintiff was still an 'arrestee' at the point that Defendant administered pepper spray at the detention center — thereby mandating a Fourth Amendment analysis under *Graham* for Plaintiff's excessive force claim — or if Plaintiff had transitioned to being a 'pretrial detainee' subject to the Fourteenth Amendment due process standard articulated in *Kingsley*. *See* Pl. Surreply at 2. Plaintiff argues that since the probable cause determination did not occur until the

---

[7] As the Tenth Circuit explained in *Austin*, "the custodial continuum run[s] through initial arrest or seizure, post-arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration." 945 F.2d at 1158.

day after she was booked into the detention center, she was not yet a pretrial detainee at the time of her booking into the detention center. Pl. Surreply at 2-3. The Court agrees that this much is clear from existing federal precedent. *See Bell v. Wolfish*, 441 U.S. 520, 536 (1979) (defining a pretrial detainee as someone who has had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest" (alterations in original)).

Because a probable cause determination had not occurred prior to Plaintiff's booking at the detention center, the Court will construe Plaintiff's excessive force claim under the Fourth Amendment and apply the objective reasonableness standard set forth in *Graham*. As Defendant himself acknowledges (Pl. Surreply at 2), the legal standard under the Fourth Amendment is essentially now the same as the standard adopted by the Supreme Court in *Kingsley* for pretrial detainees. The Supreme Court's adoption of the objective reasonableness standard for pretrial detainees in *Kingsley* and its direct reliance on *Graham* in doing so is a signal that "*Kingsley* has extended the objective reasonableness standard for use of force from the arrest stage through the probable cause hearing." *See Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 70 (1st Cir. 2016). "[W]hether the Fourth or Fourteenth Amendment standard applies presents less of a problem in cases like this one [i.e., 'persons who have been arrested but who are not yet pretrial detainees because they have not gone before a magistrate judge for a probable cause hearing'] than before." *Id.* at 70-71. Because Plaintiff was not yet a pretrial detainee at the time Defendant administered pepper spray during the booking process, the Court will apply the objective reasonableness standard set forth in *Graham* to Plaintiff's excessive force claim.

b. Qualified Immunity Analysis

Although Defendant contends that his use of pepper spray was objectively reasonable, and therefore, not excessive force under the Fourth Amendment, the Court focuses on

Defendant's second argument which is that he is entitled to qualified immunity on this claim. Defendant specifically argues that his use of pepper spray did not violate a constitutional right because his actions were objectively reasonable, and that even if a constitutional violation did occur, the law was not clearly established at the time of Plaintiff's booking that his use of pepper spray under the circumstances of this case constituted excessive force in violation of the Fourth Amendment.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When an individual defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. Specifically, the plaintiff is required to show: (1) "that the defendant's actions violated a federal constitutional or statutory right," and (2) "that the right was clearly established at the time of the defendant's unlawful conduct." *Cillo*, 739 F.3d at 460. If the plaintiff establishes both elements of the qualified immunity test, then the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *See Tolan*, 134 S. Ct. at 1866.

As to the first inquiry, the question is whether the facts, which are taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional or statutory right. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir.

2002). As to the second inquiry, the question is whether it would be clear to a defendant that his conduct was unlawful under the circumstances he confronted. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (*citing* Anderson v. Creighton, 483 U.S. 635, 641 (1987)). A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas*, 765 F.3d at 1194. "While the facts of the cases compared need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability." *Id.* (internal citation omitted). The essence of the second prong of the qualified immunity analysis is whether the state of the law at the time of the incident gave the defendant "fair warning" that his alleged conduct was unconstitutional. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). The Court may address either prong of the qualified immunity analysis first depending on "the circumstances in the particular case at hand." *See Pearson*, 555 U.S. at 236.

The Court concludes that Defendant is entitled to qualified immunity because it was not clearly established at the time of Plaintiff's booking that Defendant's use of pepper spray constituted excessive force in violation of the Fourth Amendment. It is undisputed that Defendant faced the following circumstances prior to his use of pepper spray: (1) Plaintiff appeared to be intoxicated, refused to answer questions, was cussing and otherwise was belligerent during the intake process; (2) Plaintiff was handcuffed and placed in an empty holding cell where she began kicking the door; (3) Plaintiff refused at least four times to comply with directives to change into a facility-issued jumpsuit.

Plaintiff has not pointed to any binding Supreme Court or Tenth Circuit precedent that demonstrates it was clearly established that Defendant's discharge of pepper spray under these circumstances was an objectively unreasonable use of force. Plaintiff cites to *Martinez v. New Mexico Dep't of Public Safety*, 47 F. App'x 513 (10th Cir. 2000) (unpublished), as a factually analogous case. ECF No. 36 at 10-12. However, Plaintiff's reliance on *Martinez* falls short for two reasons. First, *Martinez* is an unpublished decision and the Tenth Circuit has specifically held that, because it is unpublished, *Martinez* cannot provide an officer notice of clearly established law for qualified immunity purposes. *See Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007) (rejecting the plaintiff's reliance on *Martinez* in qualified immunity analysis and stating that "[a]n unpublished opinion, [. . .], even if the facts were closer, provides little support for the notion that the law is clearly established[.]"). Thus, while *Martinez* does provide support for Plaintiff's argument that Defendant's use of force was objectively unreasonable, it does not advance Plaintiff's argument with regard to the second prong of the qualified immunity analysis – that the law was clearly established.

Second, even though *Martinez* lends some support to Plaintiff's argument that Defendant's use of force was objectively unreasonable, important factual distinctions limit this support. In *Martinez*, the Tenth Circuit determined that the officer's use of mace during a traffic stop was objectively unreasonable because the mace was used after the suspect was already handcuffed and out of her vehicle, was not actively resisting or attempting to flee, was not physically aggressive and was no longer a danger to herself or others. *Martinez*, 47 F. App'x at 516-17. Here, although Plaintiff was already handcuffed and restricted to a holding cell, she was resisting the officers' directives and engaging in physically aggressive behavior. Further, the Tenth Circuit found it significant that the plaintiff in *Martinez* was being arrested for a crime of

minor severity – there was an outstanding misdemeanor arrest warrant for failure to appear. *Id.* In contrast, Plaintiff here was arrested for felony child abuse. (ECF No. 29-3). The *Martinez* plaintiff also indicated that she would be willing to follow the defendant's demand to get in the car if the defendant would show her his identification. *Martinez*, 47 F.App'x at 517. Thus, the Tenth Circuit noted that "Trooper Boyd could have defused the situation by showing her [his] identification . . . ." *Id.* In the present case, Plaintiff did not ever state she would comply with the officers' directives to change-out; thus, there is no indication Defendant could have easily and quickly defused the situation through other means. The other option available to the *Martinez* plaintiff—"waiting for additional back-up to help persuade plaintiff to get into the cruiser"—is something Defendant already tried by having multiple officers attempt to convince her to change clothes. *See id.*

Five years after deciding in *Martinez* that macing a handcuffed woman who refused to get into her car was objectively unreasonable, the Tenth Circuit determined that pepper-spraying an un-handcuffed woman who refused to get out of her car was objectively reasonable. *Mecham v. Frazier*, 500 F.3d 1200, 1202-05 (10th Cir. 2007). Specifically, in *Mecham,* a police officer used pepper spray and physical force to remove the plaintiff from her vehicle after she refused repeated commands to exit her car. *Id.* In reversing the district court and finding that the officer was entitled to qualified immunity because his use of force was objectively reasonable, the Court noted the length of the encounter, the fact the traffic stop occurred on a busy highway, and that the plaintiff refused to cooperate with the officer's directives while retaining her car keys and control of the vehicle. *Id.*

During oral argument, both parties argued that *Mecham* supports their respective position. Significantly, when asked at oral argument what published Tenth Circuit or Supreme

Court case most supports her argument that the law was clearly established in her favor, Plaintiff cited only to *Mecham*. Plaintiff essentially argued that *Mecham* demonstrates that compelling reasons must exist before an officer can legally resort to the use of pepper spray. Defendant essentially argued that the determination in *Mecham* that it was constitutional to use pepper spray to gain compliance demonstrates that officers may use pepper spray as a means to obtain compliance with their reasonable directives. The Court agrees that there are factors justifying the use of pepper spray in *Mecham* that do not exist in the present case. For instance, the plaintiff in *Mecham* maintained control of her vehicle and had the ability to flee the scene. That the defendant in *Mecham* did not have control of the plaintiff is a factor supporting the legal use of pepper spray that does not exist in the present case. Here, Plaintiff was handcuffed in an empty holding cell and, as Defendant acknowledged in his deposition, was not a threat to his safety or the safety of the other detention officers. Further, drawing factual inferences in favor of Plaintiff, a greater urgency existed with regard to the need to obtain the *Mecham* plaintiff's compliance: she was stopped on the shoulder of a busy highway which created a danger to both the defendant and plaintiff. Here, while giving Plaintiff time to calm down might have slowed the booking process of other detainees, it would not have created a dangerous situation.

On the other hand, this case presents facts not present in *Mecham* that weigh on the other side of the balance. Unlike the plaintiff in *Mecham*, Plaintiff was belligerent; her apparent intoxication, cussing at officers, and violently kicking the door of her holding cell create a reasonable concern that she might violently lash out at an officer. Similar to the *Mecham* plaintiff, Plaintiff here also refused repeated requests to follow a reasonable directive. And, importantly, the Tenth Circuit in *Mecham* did conclude that officers can constitutionally use pepper spray to get a person to comply with their directive to get out of the car, even when that

person was pulled over for a minor traffic violation and is passively sitting in the car.

On balance, the Court concludes that greater justification existed to use pepper spray on the plaintiff in *Mecham* than existed to justify its use in this case. The Court also concludes, however, that *Mecham* falls far short of providing fair warning that pepper spraying a belligerent and angry detainee in an effort to get her to change into a facility-issued jumpsuit, after she has repeatedly refused to do so, would violate her constitutional rights. In other words, the Tenth Circuit's conclusion that pepper-spraying a motorist who refused to get out her car was constitutional fails to clearly establish that pepper spraying a detainee who repeatedly refuses to put on a jumpsuit is unconstitutional.

Further undermining Plaintiff's argument is the Tenth Circuit's unpublished opinion in *Giannetti v. City of Stillwater*, 216 F. App'x 756 (10th Cir. 2007) (unpublished). Although unpublished, this decision is useful for its persuasive value. *See* 10th Cir. Rule 32.1. Like Plaintiff in the present case, after being arrested, Ms. Giannetti refused to change into her prison garb. *Id*. at 759. Unlike Plaintiff, however, as the defendant officers in *Giannetti* were aware, Ms. Giannetti suffered from mental illness. *Id.* at 758. At some point following her verbal protests, Ms. Giannetti hit a dispatcher in the jaw who was trying to get her to change clothes. *Id*. at 759. Other officers then came into the room and handcuffed Ms. Giannetti, who fell to her knees. *Id*. Several officers then proceeded to forcibly change Ms. Giannetti. *Id*. During the majority of the ten to fifteen minutes that the encounter lasted, Ms. Giannetti "struggle[ed] with three male officers – kicking with her legs, moving her head, and using her nails to dig into one officer's arm – while the officers held her legs, arms, head, and back down in an effort to keep her from moving." *Id*. at 760. During this struggle, Ms. Giannetti at least twice screamed that her lungs were collapsing, at least once indicated that she could not breathe, moaned, and begged for the

officer to "stop, you're killing me you're hurting me." *Id*. One officer testified that Ms. Giannetti pleaded during the struggle, "please stop, oh, God, please." *Id*. Not long after the struggle ended, Ms. Giannetti collapsed and died. *Id*.

In determining that the defendant officers were entitled to qualified immunity, Judge Henry, who five years earlier authored *Martinez*, wrote, "[w]e conclude that the officers' continued use of force to restrain Ms. Giannetti, although perhaps not the least intrusive choice that they could have made, was not unreasonable in response to her escalating opposition." *Id*. at 766. The level of force used to get Plaintiff to change into a jumpsuit in this case was less than the level of force used to get Ms. Giannetti to change into her jumpsuit. Moreover, the officers in *Giannetti* could have easily given Ms. Giannetti time to cool down after hand-cuffing her. Instead, they chose to use force to get her changed. This undermines Plaintiff's argument that officers should not be allowed to use force as a means to get a detainee to change into a prison jumpsuit. Because *Giannetti* also involved an arrestee's refusal to put on a jail jumpsuit, it has persuasive value and supports a finding that the law was not clearly established at the time of Plaintiff's booking that Defendant's use of pepper spray under the circumstances was unconstitutional.

In addition to arguing that Defendant's act of pepper-spraying was unconstitutional, Plaintiff argues in her briefing that Defendant also violated her Fourth Amendment rights by keeping her in a pepper-spray contaminated cell for at least three[8] minutes thereafter.[9] The

---

[8] As set forth above, the Court concludes that the evidence submitted does not support a finding that Plaintiff was in the cell by herself after having been pepper-sprayed for more than five minutes. In response to the Court's question during oral argument about what factual finding it should make on this point, rather than arguing about how much time Plaintiff spent alone in the cell after being pepper-sprayed, Plaintiff argued that, regardless of whether the time was three minutes or something more, the period she was kept in the cell after being pepper-sprayed was unconstitutional.

parties do not dispute that, immediately after Defendant pepper-sprayed Plaintiff the officers involved in this case walked away from the cell to avoid the effects of the pepper spray. Nor do the parties dispute that the effects of the pepper spray were so strong that when Officer Jojola went back into the cell, her eyes started burning, she had trouble breathing, and was coughing to the point that she almost vomited. ECF No. 33-2 at 56-58. Again, rather than determining whether keeping Plaintiff in the pepper-spray contaminated cell for a short time period was objectively reasonable, the Court will decide whether Defendant had fair warning that it was not. The Court is unaware of any case that would place Defendant on notice that leaving a detainee in a cell for a short period after administering the pepper spray would violate her constitutional rights. Thus, the Court concludes that Defendant is entitled to qualified immunity on Plaintiff's excessive force claim and this claim is dismissed with prejudice.

### 2. Plaintiff's Battery Claim under the NMTCA (Count II)

Defendant also seeks summary judgment on Plaintiff's state law claim for battery. Def. Mot. at 17-19. Plaintiff alleged in her complaint that Defendant's act of administering pepper spray constitutes a battery within the meaning of Section 41-4-12 of the NMTCA. ECF No. 1-2 at 4. Specifically, she argued that Defendant's "purposeful[] and deliberate[]" act of administering pepper spray was an "intentional touching . . . done in a rude, insolent, and/or angry manner" and "without legal justification." ECF No. 1-2 at 4. Defendant argues that he is entitled to summary judgment on the battery claim because (1) his conduct was not unlawful, (2) the pepper spray was no more force than reasonably necessary to restore institutional order, and

---

[9] In her Complaint, Plaintiff does not allege that Defendant violated the constitution by keeping her in a pepper-spray contaminated cell for an unduly long period of time. As a result, at oral argument, the Court invited the parties to address whether the Complaint would have to be amended for Plaintiff to pursue this theory of liability. Neither party, however, addressed this issue. Nonetheless, the discovery propounded and briefing in this case make clear that the parties have been proceeding under the assumption that Plaintiff would be able to pursue this theory of liability.

(3) the pepper spray was used for the purpose of maintaining "control and discipline in the detention facility." *See* Def. Mot. at 18. For the reasons set forth below, the Court will deny Defendant's motion for summary judgment on the battery claim.

The NMTCA "preserves sovereign immunity against tort claims for state governmental entities and public employees acting in the scope of their duties, except as specifically waived. *Fernandez v. Mora-San Miguel Elec. Coop., Inc.*, 462 F.3d 1244, 1250 (10th Cir. 2006); NMSA 1978, § 41-4-4(A) (2001). In this case, Plaintiff relies upon Section 41-4-12 of the NMTCA, which waives sovereign immunity for tort claims "caused by law enforcement officers while acting within the scope of their duties." *See* NMSA 1978, § 41-4-12 (1977). "[I]n order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 1996-NMSC-021, ¶ 7, 916 P.2d 1313. Battery is one of the torts specifically enumerated in Section 41-4-12.[10]

New Mexico has thus far declined to adopt a uniform jury instruction on battery because there is "insufficient New Mexico law on [civil] assault and battery." UJI 13-1624 NMRA. As this Court has recently summarized, however, "New Mexico's civil-battery law is modeled after the *Restatement (Second) of Torts*." *Pena v. Greffet*, 108 F. Supp. 3d 1030, 1061 (D.N.M. 2015).

---

[10] Section 41-4-12 states in relevant part:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, *battery*, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties. (emphasis added).

As set forth in the Restatement, a tortfeasor is liable for battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." *State v. Ortega*, 1992-NMCA-003, ¶ 12, 87 P.2d 152 (citing Restatement (Second) of Torts § 18); *see also Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1208-09 (10th Cir. 2006). The Restatement provides generally that "[a]ny bodily contact is offensive 'if it offends a reasonable sense of personal dignity.'" *See Fuerschbach*, 439 F.3d at 1209 (quoting Restatement (Second) of Torts § 19); *see also Pena*, 108 F. Supp. 3d at 1061 (noting that "[n]ormally, the severity-of-contact threshold for battery is so low as to be nearly nonexistent, requiring only a 'harmful or offensive contact.'"). However, the battery claim in this case has been brought against a law enforcement officer[11] and special privileges are afforded to officers that do not subject them to civil liability under particular circumstances. With respect to officers, the Restatement provides that the amount of force that can be used is as follows: "[t]he use of force against another for the purpose of effecting the arrest or recapture of the other, or of maintaining the actor's custody of him, is not privileged if the means employed are in excess of those which the actor reasonably believes to be necessary." *Pena*, 108 F. Supp. 3d at 1062 (citing Restatement (Second) of Torts § 132).

In *Mead v. O'Connor*, a state police officer in Chama took an allegedly drunk tavern patron by the arm and shoulder and tossed him out the tavern door. 1959-NMSC-077, ¶ 3, 344 P.2d 478. Unfortunately, this ejection resulted in his having a compound fracture and shattered bones in his leg. *Id*. The patron sued the police officer for assault, a jury awarded the plaintiff compensatory and punitive damages, and the police officer appealed. *Id*. On appeal, the New

---

[11] The parties do not dispute that Defendant was acting as a law enforcement officer for purposes of the NMTCA.

Mexico Supreme Court recognized that, in making an arrest, an officer is, "entitled to use such force as was reasonably necessary under all the circumstances of the case" and that "[o]fficers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace." *Id*. at ¶ 4. Further, "[w]hen acting in good faith, the courts will afford them the utmost protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court." *Id*. Despite this deference to the judgment of law enforcement officers at the time of the incident, however, the New Mexico Supreme Court affirmed the jury verdict and recognized that, ultimately, "it devolves upon the jury, under the evidence in the case and proper instruction of the court, to resolve these questions." *Id*.

That it is usually the job of a jury to decide whether a law enforcement officer committed battery in using force to enforce the law has been a consistent refrain among courts considering New Mexico law since *Mead* was decided. *See, e.g.*, *Pena*, 108 F. Supp. 3d at 1061-63 (whether correction officer committed battery by pushing detainee against wall to get her attention after she refused to respond to question is issue for jury to decide); *St. John v. McColley*, 653 F. Supp. 2d 1155, 1165 (D.N.M. 2009) (whether officer who escorted movie patron from movie theatre committed battery "is a question best left to a jury"); *State v. Ellis*, 2008-NMSC-032, ¶ 17, 186 P.3d 245 ("[G]enerally, the question of the reasonableness of the actions of the officer . . . is a question of fact for the jury") (quoting *Alaniz v. Funk*, 1961-NMSC-140, ¶ 9, 364 P.2d 1033). Only if, after drawing all reasonable factual inferences in favor of Plaintiff, the Court determines that no reasonable jury could decide in Plaintiff's favor can the Court grant Defendant's motion for summary judgment on the battery claim. *Ellis*, 2008-NMSC-032, ¶ 17.[12]

---

[12] This summary judgment standard, of course, applies to federal and state law claims. For claims of federal constitutional violations, however, absent material questions of fact, the Court decides what is

Further, the Court notes that the analysis of whether a defendant law enforcement officer committed battery under New Mexico law is different than the analysis of whether that same officer should be held liable for allegedly violating a plaintiff's federal constitutional rights. The most important distinction is that, under state law, an officer is not entitled to qualified immunity. Thus, a plaintiff does not have to demonstrate that the right allegedly violated was clearly established. In addition, as discussed earlier, the determination of whether an officer's use of force was excessive under the Fourth Amendment is analyzed under an objective reasonableness standard without regard to the officer's subjective intent. While New Mexico courts have not clearly indicated whether a law enforcement officer's subjective intent impacts the determination of whether a civil battery occurred, "an officer's good faith appears to be the prerequisite for the exercise of a court's sympathetic review of an arrest: '[s]o long as officers act in good faith and use no more force than reasonably necessary to preserve the peace, they are accorded reasonable latitude in the use of force.'" *Tanberg v. Sholtis*, 401 F.3d 1151, 1168 (10th Cir. 2005) (quoting *State v. Prince*, 1999-NMCA-010, ¶ 12, 972 P.2d 859, and citing *Mead*, 1959-NMSC-077, ¶¶ 4-5); *see also St. John*, 653 F. Supp. 2d at 1165 (in addition to determining whether the defendants' contact was offensive to plaintiffs' sense of personal dignity, "a jury must determine whether Defendants are protected by having acted reasonably and in good faith.").

Drawing all reasonable factual inferences in favor of Plaintiff, after pepper-spraying Plaintiff, Defendant and the other detention officers left Plaintiff alone in the pepper-sprayed contaminated holding cell even though, according to Defendant's deposition testimony,

---

objectively reasonable – even in close cases. *See Mecham*, 500 F.3d at 1203 ("the question of objective reasonableness is *not* for the jury to decide where the facts are uncontroverted"). The same may not be true for state law battery claims. *See Mead*, 1959-NMSC-077, ¶ 4 (it devolves upon the jury to resolve whether a law enforcement officer's use of force was reasonably necessary).

Plaintiff's reaction to being pepper sprayed was to sit down and become quiet. Def. Dep. 50:15-23. Plaintiff thereafter remained alone in the pepper spray contaminated cell for three to five minutes. Under these facts, the Court determines that it is plausible that a reasonable jury could find that Defendant committed civil battery under New Mexico law. In particular, it is plausible that a reasonable jury could conclude that Defendant's decision to leave Plaintiff in her cell after pepper spraying her and after she calmed down was not done in good faith.[13] With regard to the parties' dispute about how long Plaintiff was in her cell after the pepper spray was administered, the Court must draw all factual inferences in favor of Plaintiff. Under Plaintiff's version of the facts, a reasonable jury could plausibly find that Defendant acted unreasonably by pepper-spraying Plaintiff without first warning her that pepper-spraying would be the consequence of her refusal to dress-out and then keeping her in a pepper spray contaminated cell for an unreasonable amount of time.

For these reasons, the Court denies Defendant's motion for summary judgment on Plaintiff's state law battery claim.

---

[13] Exactly what this good faith requirement entails is open to debate. In *Pena*, Judge James O. Browning ruled that, to grant summary judgment for a correction officer who allegedly committed battery by pushing a detainee against a wall to get her attention after she refused to respond to a question, the Court would have to find that "no jury could reasonably find that the defendant subjectively believed that his level of physical force was in excess of what was necessary." *Pena*, 108 F.Supp.3d at 1063. However, in "determin[ing] the appropriate standard of analysis for determining whether an officer's use of force was excessive, sufficient to justify a limited claim of self-defense" in a criminal case, the New Mexico Supreme Court indicated that this determination may not have a subjective component. *Ellis*, 2008-NMSC-032, ¶¶ 21- 34. In *Ellis*, the New Mexico Supreme Court stated that it was "informed by federal jurisprudence regarding the Fourth Amendment's protections against unreasonable searches and seizures, including the protection against excessive force (an unreasonable seizure) in the course of an arrest." *Id*. at ¶ 25. The New Mexico Supreme Court then stated that, "[a]n objective view, however, based on a reasonable officer's opinion about the use of force, *and not on the officer's subjective view*, comports with our view that a well-trained police officer, within reasonable limits, is in the best position to judge the force necessary to enable them to make arrests or to preserve the peace." *Id*. at ¶ 28 (emphasis added, internal quotation and ellipses omitted).

## VI.  CONCLUSION

Based on the foregoing, the Court concludes that:

1. Defendant's Motion for Summary Judgment (ECF No. 29) is hereby granted with respect to Plaintiff's Fourth Amendment violation claims as set forth in Count I of Plaintiff's Complaint and denied with respect to Plaintiff's state law Battery claims set forth in Count II of Plaintiff's Complaint.

2. Plaintiff's Motion for Summary Judgment (ECF No. 30) is hereby denied.

**IT IS SO ORDERED.**

UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**